UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| CASSEY A.,[1] | ) |
| | ) |
|       *Plaintiff*, | ) |
| | ) |
|       v. | )    No. 1:23-cv-02202-JMS-MG |
| | ) |
| MARTIN J. O'MALLEY, | ) |
| *Commissioner of the Social Security* | ) |
| *Administration*, | ) |
| | ) |
|       *Defendant*. | ) |

**ENTRY REVIEWING THE COMMISSIONER'S DECISION**

Plaintiff Cassey A. filed for disability benefits with the Social Security Administration ("SSA"), alleging a disability onset date of October 19, 2021. [Filing No. 9-2 at 11.] Her application was denied initially and upon reconsideration, [Filing No. 9-2 at 11], and a hearing was held before Administrative Law Judge Brian Burgtorf ("the ALJ"). [Filing No. 9-2 at 32-57.]

The ALJ issued a decision denying Cassey A. benefits, [Filing No. 9-2 at 20,] and the Social Security Appeals Council upheld the ALJ's decision and denied Cassey A.'s request for review. [Filing No. 9-2 at 2.] Cassey A. then filed suit, asking this Court to review her denial of benefits. [Filing No. 1.]

---

[1] To protect the privacy interests of claimants for Social Security benefits, consistent with the recommendation of the Court Administration and Case Management Committee of the Administrative Office of the United States Courts, the Southern District of Indiana has opted to use only the first name and last initial of non-governmental parties in its Social Security judicial review opinions.

# I.
## STANDARD OF REVIEW

"The Social Security Administration provides benefits to individuals who cannot obtain work because of a physical or mental disability." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1151 (2019). Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." *Hess v. O'Malley*, 92 F.4th 671, 677 (7th Cir. 2024) (quoting 42 U.S.C. § 423(d)).

When an applicant appeals an adverse benefits decision, the Court "will reverse an ALJ's decision only if it is the result of an error of law or if it is unsupported by substantial evidence." *Martin v. Kijakazi*, 88 F.4th 726, 729 (7th Cir. 2023) (citing *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021)). Substantial evidence is "evidence that 'a reasonable mind might accept as adequate to support a conclusion.'" *Zoch v. Saul*, 981 F.3d 597, 601 (7th Cir. 2020) (quoting *Biestek*, 139 S. Ct. at 1154). "Although this Court reviews the record as a whole, it cannot substitute its own judgment for that of the SSA by reevaluating the facts, or reweighing the evidence to decide whether a claimant is in fact disabled." *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018) (citation omitted). Reviewing courts also "do not decide questions of credibility, deferring instead to the ALJ's conclusions unless 'patently wrong.'" *Zoch*, 981 F.3d at 601 (quoting *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017)). "But even under this deferential standard of review, an ALJ 'must provide a logical bridge between the evidence and [the] conclusions.'" *Jarnutowski v. Kijakazi*, 48 F.4th 769, 774 (7th Cir. 2022) (quoting *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021)).

The SSA applies a five-step evaluation to determine whether a claimant is disabled. *Hess*, 92 F.4th at 677 (citations omitted); 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4). The ALJ must evaluate the following, in sequence:

(1) whether the claimant is currently [un]employed;

(2) whether the claimant has a severe impairment;

(3) whether the claimant's impairment meets or equals one of the impairments listed by the [Commissioner];

(4) whether the claimant can perform [her] past relevant work; and

(5) whether the claimant is capable of performing work in the national economy.

*Hess*, 92 F.4th at 677 (quoting *Zurawski v. Halter*, 245 F.3d 881, 885 (7th Cir. 2001)). A claimant is disabled if she satisfies Steps One, Two, and Three. *Gedatus*, 994 F.3d at 898. If a claimant satisfies Steps One and Two, but not Step Three, the claimant must then satisfy Step Four to be found disabled. *See id.* "The burden of proof is on the plaintiff at steps one through four, but the burden shifts to the Commissioner at step five." *Wilder v. Kijakazi*, 22 F.4th 644, 651 (7th Cir. 2022). "[I]f the ALJ can make a conclusive finding at any step that the claimant either is or is not disabled, then []he need not progress to the next step." *Hess*, 92 F.4th at 677-78 (quotations and citation omitted).

After Step Three, but before Step Four, the ALJ must determine a claimant's residual functional capacity ("RFC"), which is an assessment of "the most an individual can work despite his or her limitations or restrictions." *Jarnutowski*, 48 F.4th at 773 (citation omitted). An ALJ must consider seven strength functions when assessing a claimant's RFC to work: "lifting, carrying, sitting, standing, walking, pushing, and pulling." *Id.* at 773-74 (citing SSR 96-8p, 61 Fed. Reg. 34474, 34477 (July 2, 1996)). An ALJ must also describe "how the evidence supports each conclusion [on strength functions], citing specific medical facts (e.g., laboratory findings)

3

and nonmedical evidence (e.g., daily activities, observations)." *Jarnutowski*, 48 F.4th at 773 (quoting SSR 96-8p, 61 Fed. Reg. at 34478). "In making a proper RFC determination, the ALJ must consider all of the relevant evidence in the record, even limitations that are not severe and may not dismiss a line of evidence contrary to the ruling." *Id.* at 774 (quotations and citation omitted). "Essentially, an ALJ's RFC analysis 'must say enough to enable review of whether the ALJ considered the totality of a claimant's limitations.'" *Id.* (quoting *Lothridge v. Saul*, 984 F.3d 1227, 1233 (7th Cir. 2021)). The ALJ uses the RFC at Step Four to determine whether the claimant can perform her own past relevant work and if not, at Step Five to determine whether the claimant can perform other work. *See* 20 C.F.R. § 404.920(a)(4)(iv), (v).

If the ALJ's decision "uses the correct legal standards, is supported by substantial evidence, and builds an accurate and logical bridge from the evidence to the ALJ's conclusions," the Court must affirm the denial of benefits. *Hess*, 92 F.4th at 677 (quotations and citation omitted); *see also Morales v. O'Malley*, 103 F.4th 469, 471 (7th Cir. 2024) ("ALJs are 'subject to only the most minimal of articulation requirements'—an obligation that extends no further than grounding a decision in substantial evidence.") (quoting *Warnell v. O'Malley*, 97 F.4th 1050, 1053 (7th Cir. 2024)). But if the ALJ's decision "is based on incorrect legal standards or unsupported by substantive evidence," the Court will remand for further consideration. *Baptist v. Kijakazi*, 74 F.4th 437, 441 (7th Cir. 2023) (citations omitted).

## II.
### BACKGROUND[2]

The ALJ followed the five-step sequential evaluation set forth by the SSA in 20 C.F.R. § 416.920(a)(4) and ultimately concluded that Cassey A. was not under a disability at any

---

[2] The relevant evidence of record is amply set forth in the parties' briefs and need not be repeated here. Specific facts relevant to the Court's disposition of this case are discussed below.

time since "December 2, 2021, the date the application was filed." [Filing No. 9-2 at 20.]

Specifically, the ALJ found the following:

- At Step One, Cassey A. has not engaged in substantial gainful activity[3] since December 2, 2021, the application date. [Filing No. 9-2 at 13.]

- At Step Two, Cassey A. has the following severe impairments: fibromyalgia, edema, major depressive disorder, arthritis, post-traumatic stress disorder, bipolar disorder, personality disorder, asthma, anxiety, and degenerative disc disease. [Filing No. 9-2 at 13.]

- At Step Three, Cassey A.'s impairments (or combination of impairments) do not meet or medically equal the severity of one of the listed impairments. (20 C.F.R. § 404.1520(d), 404.1525, and 404.1526). [Filing No. 9-2 at 14.] After Step Three but before Step Four, Cassey A. had the RFC to do as follows:

    > perform light work as defined in 20 CFR 416.967(b) except that the claimant can never climb ladders, ropes, or scaffolds; can frequently balance; can occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl; can frequently handle and finger; can work in a moderate noise environment, as defined by the Selected Characteristics of Occupations (SCO); can never work around humidity, vibration; can have occasional concentrated exposure to atmospheric conditions, as defined by the SCO; can understand, remember, and carry out detailed, but not complex, instructions, and make detailed work-related decisions; can occasionally interact with the general public, but none including customer service, negotiation, nor dispute resolution; cannot engage in tandem tasks, nor work involv[ing] work dependent on upstream and downstream cooperation; can tolerate occasional changes in the routine work environment. [Filing No. 9-2 at 16.]

- At Step Four, Cassey A. has no past relevant work. [Filing No. 9-2 at 19.]

---

[3] Substantial gainful activity is defined as work activity that is both substantial (*i.e.*, involves significant physical or mental activities) and gainful (*i.e.*, work that is usually done for pay or profit, whether or not a profit is realized). 20 C.F.R. § 404.1572(a).

- At Step Five, relying on the testimony of the vocational expert ("VE") and considering Cassey A.'s age, education, work experience, and RFC, there are jobs that exist in sufficient numbers in the national economy that she can perform, such as "marker, "routing clerk," and "router." [Filing No. 9-2 at 19-20.]

## III.
### DISCUSSION

Cassey A. argues that the ALJ erred in his "consideration of the evidence under SSR 16-3p." [Filing No. 11 at 17.] She asserts that "it is error for an ALJ to rely on a perception of a lack of aggressive treatment absent evidence of accepted, appropriate treatment." [Filing No. 11 at 18.] She states that instead of abiding by that rule, the ALJ "remarked that Cassey [A.]" had "no frequent emergency room visits or inpatient hospitalization," but did have "routine medication and follow-up appointments," amounting to "conservative[]" treatment. [Filing No. 11 at 18.] Cassey A. argues that the ALJ should have explained how those factors "diminished the severity of her symptoms." [Filing No. 11 at 18.] Cassey A. argues that such reasoning is especially important for her severe impairment of fibromyalgia. [Filing No. 11 at 19.] She states that with fibromyalgia, "a person may very well be in disabling pain" yet have "[s]eemingly normal objective examinations." [Filing No. 11 at 19.] She argues that under SSR 12-2P, the ALJ should have considered "all evidence in the record" to determine whether her fibromyalgia medically equaled a listing alone or in combination with other conditions. [Filing No. 11 at 20-21.] Cassey A. argues that instead, the ALJ provided "no analysis at all," dismissing "the possibility of [her] fibromyalgia equaling any listing criteria 'in two sentences.'" [Filing No. 11 at 21.] According to Cassey A., this amounts to the ALJ "impermissibly play[ing] doctor." [Filing No. 11 at 21.] Cassey A. points out that the ALJ stated she "had no inpatient hospitalizations," and "no[] . . . suicidal ideations," yet ignored her "inpatient hospitalization for a suicide attempt." [Filing No. 11 at 23.] Cassey A. states that the ALJ found that she engaged in "activities of daily living" like "managing

6

medication" and "attending medical appointments," but ignored the fact that "there are critical differences between keeping up with activities of daily living and holding down a full-time job." [Filing No. 11 at 23.] Cassey A. asserts that the ALJ emphasized her part-time job but should not have "draw[n] conclusions about [her] ability to work full time based on part-time employment," especially given that her impairment "forced [her] to stop after a short time." [Filing No. 11 at 24-25.]

In his response, the Commissioner argues that the ALJ "adequately addressed fibromyalgia in his listing analysis." [Filing No. 14 at 6.] He argues that the ALJ recognized that fibromyalgia could be compared to another listed impairment, like inflammatory arthritis, or considered in combination with other impairments. [Filing No. 14 at 7.] He argues that the ALJ ultimately concluded that Cassey A. "had not demonstrated she had a level of fibromyalgia" under either of those methods. [Filing No. 14 at 7.] The Commissioner states that "while the ALJ's findings about fibromyalgia as it relates to the step three listing analysis was contained primarily in one paragraph," "the ALJ also provided discussions of [Cassey A.'s] severe and non-severe impairments in other parts of the decision, including the medical reports containing objective medical evidence, and the evaluation of [Cassey A.'s] symptoms." [Filing No. 14 at 7.] The Commissioner argues that the ALJ did not "offer[] an independent medical judgment about fibromyalgia" since the ALJ's finding "is supported by the prior administrative medical findings on the listings question from state agency physicians." [Filing No. 14 at 8.] Reading the ALJ's analysis "as a whole," the Commissioner argues that Cassey A. should not rely "only on the part" of the decision with which she disagrees. [Filing No. 14 at 9.] The Commissioner argues that "substantial evidence supports the ALJ's evaluation of [Cassey A.'s] symptoms and work capacity." [Filing No. 14 at 9.] He states that "the ALJ cited multiple factors, such as objective medical

7

evidence and clinical findings pertaining to [Cassey A.'s] impairments, her treatment history and positive responses to medication, [her] reports to the agency and her treating sources, [her] daily activities, and the record medical opinions." [Filing No. 14 at 10.] The Commissioner notes, for example, that "fibromyalgia is usually not disabling and clinical, [so] tender-point tests can verify the existence of the condition but not its severity." [Filing No. 14 at 13.] In evaluating its severity, the Commissioner argues that the ALJ considered Cassey A.'s pain, properly considered "inconsistencies between the severity of symptoms reported at the hearing," and compared her "physical examinations and test findings," and simply concluded that her symptoms "were not as limiting as she claimed." [Filing No. 14 at 12-13.] As it pertains to Cassey A.'s activities of daily living, the Commissioner states that the ALJ considered that her doctor found her to be "active," that she worked part-time, and that she could walk a mile and lift thirty pounds. [Filing No. 14 at 14.] The Commissioner states that Cassey A. "virtually ignores the only physician opinions on work capacity," which the ALJ found persuasive and supported by specific citations to medical reports and consistent with other medical records. [Filing No. 14 at 15.] The ALJ asserts that Cassey A. "cited no medical source opinions that suggested a greater degree of work limits than the ALJ found. [Cassey A.'s] suggestion that she had a disabling degree of work limits due to fibromyalgia pain is poorly developed and lacks support, and therefore she has waived this issue." [Filing No. 14 at 15.] As it pertains to mental health, the Commissioner argues that the "ALJ weighed evidence of [her] part-time work . . . against the interaction limits assessed by the state agency psychologists, noted the apparent inconsistency, but nevertheless credited the psychologists' interaction limits anyway." [Filing No. 14 at 17.] The Commissioner states that the ALJ "did not cite [her] part-time work to find she could perform full-time work"; rather, he "considered her part-time work in deciding how much [she] was limited in getting along with

others." [Filing No. 14 at 17-18.] The Commissioner states that Cassey A. has not "identified [any] of her own treating medical providers as having assessed limits on her work capacity." [Filing No. 14 at 18.] Regarding Cassey A.'s hospitalization, the Commissioner states that it was not for a suicide attempt, but for "major depressive disorder without psychosis, . . . [not] suicidal ideation, homicidal ideation, or self-harm behaviors." [Filing No. 14 at 19.]

Cassey A. replies that the Commissioner's argument only "reiterat[es] the error in assessing fibromyalgia claims, where objective abnormal findings are not typically present." [Filing No. 16 at 2.] She argues that the doctrine of harmless error "is not an exercise in providing rationale for the ALJ's ultimate conclusion." [Filing No. 16 at 2.] She states that although the ALJ "found the opinions of the state agency consultants to be persuasive," those opinions predated Cassey A.'s hospital stay, which was not "simply an isolated incident of taking too much medication." [Filing No. 16 at 2-3.] Cassey A. asserts that to rely on such opinions without considering the new evidence was to play doctor. [Filing No. 16 at 3.] While Cassey A. acknowledges that the Court shall not "reweigh the evidence," she also states that the Court ought not "simply rubber-stamp the Commissioner's decision without a critical review of the evidence." [Filing No. 16 at 3.]

As the Seventh Circuit has explained, "[f]ibromyalgia is a syndrome involving chronic widespread and diffuse pain throughout the entire body, frequently associated with fatigue, stiffness, skin tenderness, and fragmented sleep." Estok v. Apfel, 152 F.3d 636, 637 n.1 (7th Cir. 1998). The condition's principal symptom is "pain all over." Sarchet v. Chater, 78 F.3d 305, 306 (7th Cir. 1996). Fibromyalgia can be diagnosed by showing "multiple tender spots" on at least 11 of 18 "fixed locations on the body" which "when pressed firmly cause the patient to flinch." Id. "There are no laboratory tests for the presence or severity of fibromyalgia." Id. So, "[o]f greatest importance to disability law, its symptoms are entirely subjective." Id.

9

To evaluate subjective evidence of fibromyalgia, an ALJ must apply SSR 12-2P in conjunction with SSR 16-3P. SSR 12-2P, "Evaluation of Fibromyalgia," 2012 WL 3104869, at *5 (July 25, 2012) (relying on SSR 96-7, *superseded by* SSR 16-3P, "Evaluation of Symptoms in Disability Claims," 2017 WL 5180304 (Oct. 25, 2017)). Pursuant to those rulings, after an ALJ determines a disability claimant has fibromyalgia, the ALJ evaluates "the intensity and persistence of the person's pain or any other symptoms and determines the extent to which the symptoms limit the person's capacity for work. If objective medical evidence does not substantiate the person's statements about the intensity, persistence, and functionally limiting effect of symptoms, [the ALJ] consider[s] all of the evidence in the case record," which includes:

- "the person's daily activities";
- "medications or other treatments the person uses, or has used, to alleviate symptoms"; and
- "the nature and frequency of the person's attempts to obtain medical treatment for symptoms."

SSR 12-2P, 2012 WL 3104869, at *5.

### A. The ALJ's Evaluation of the Evidence

#### 1. *Conservative Treatment*

An ALJ must rely on medical evidence in determining that a disability applicant's treatment was conservative, which would suggest that the applicant is not disabled. *See Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009) (admonishing ALJ for "reach[ing] his own independent medical conclusion" that the disability applicant's condition "was less serious because it was treated" in a particular way). In this case, the ALJ found that Cassey A. was treated "conservatively" based on objective findings from "[n]eurological and musculoskeletal exam[s]" and a lack of "frequent emergency room visits and inpatient hospitalization." [Filing No. 9-2 at 17.] The Court is "troubled by the ALJ's purported use of objective medical evidence to discredit [Cassey A.'s]

10

complaints of disabling pain." *Akin v. Berryhill*, 887 F.3d 314, 318 (7th Cir. 2018) (vacating and remanding in favor of disability claimant with fibromyalgia). "[F]ibromyalgia pain cannot be measured with objective tests." *Gerstner v. Berryhill*, 879 F.3d 257, 264 (7th Cir. 2018) (vacating and remanding in favor of disability claimant with fibromyalgia). Diagnosing fibromyalgia relies on subjective symptoms, and Cassey A. testified that her symptoms were debilitating, leaving her bedridden "for weeks at a time," and requiring her to "prop her legs up at least three [or] four times a day" and "lay down in the middle of the day" for up to two hours in order to catch up on lost sleep. [Filing No. 9-2 at 40-44.] In using inapplicable objective evidence to controvert Cassey A.'s subjective evidence, the ALJ's analysis of Cassey A.'s fibromyalgia was erroneous. The ALJ's analysis reveals that he "misunderstood the nature of [Cassey A.'s] fibromyalgia pain," producing a gap in what should have been a logical bridge. *Gerstner*, 879 F.3d at 264. It was likewise erroneous to rely on a lack of frequent emergency room visits and inpatient hospitalization. "Unless emergency treatment can be expected to result in relief, unscheduled treatment in fact makes no sense." *Schomas v. Colvin*, 732 F.3d 702, 709 (7th Cir. 2013) (rejecting argument that lack of emergency room visits indicate conservative treatment). There is no evidence that emergency treatment would result in relief for Cassey A. A person who has fibromyalgia is likely to have pain that waxes and wanes. *Gerstner*, 879 F.3d at 260 (vacating and remanding in favor of disability applicant whose fibromyalgia had "good and bad days").

The ALJ's erroneous analysis of conservative treatment extends to Cassey A.'s mental health. The ALJ found that Cassey A.'s major depressive disorder was "treated conservatively, with routine medication and counseling sessions throughout the period at issue. The record shows minimal, infrequent changes to her medication regimen." [Filing No. 9-2 at 18.] The ALJ continues to state that Cassey A. did not exhibit thoughts of suicide. [Filing No. 9-2 at 18.] Such

11

a statement, however, is flatly contradicted by the record. From September 11, 2022, to September 15, 2022, Cassey A. was involuntarily admitted to a hospital with an emergency detention order because she "[a]ttempted to overdose." [Filing No. 9-10 at 157-59.] The hospital noted that Cassey A. exhibited "[s]uicidal, self-injurious threats, gestures or behaviors," "[f]ailed to respond to treatment . . . such that symptoms . . . worsened," and could not be discharged because of the risk of "safety issues," "minimal improvement," and "imminent re-hospitalization." [Filing No. 9-10 at 163; Filing No. 9-10 at 172.] While the Commissioner argues that by the end of her stay, Cassey A. allegedly had "no suicidal ideation" from this supposedly "isolated incident," [Filing No. 14 at 19], the Commissioner ignores the fact that less than two weeks after being involuntary admitted, Cassey A. was admitted again, this time for a longer stay. [Filing No. 9-10 at 187 (showing admission on September 26, 2022, and discharge on October 19, 2022).] Far from an isolated incident, Cassey A. confirmed multiple prior overdoses and a "history of holding [a] loaded gun to [her] own head." [Filing No. 9-10 at 187.] Her final diagnosis from that admission was "[m]ajor [d]epressive [d]isorder . . . with psychotic features." [Filing No. 9-10 at 188.]

As should be abundantly clear, hospital admission for suicide attempts is not conservative treatment. To conclude otherwise was error. *See, e.g.*, *Farrell v. Astrue*, 692 F.3d 767, 773 (7th Cir. 2012) (reversing and remanding in favor of disability claimant with fibromyalgia and depression who "was hospitalized on more than one occasion because of her suicidal tendencies"); *Larson v. Astrue*, 615 F.3d 744, 750 (7th Cir. 2010) (reversing and remanding in favor of disability applicant where "the ALJ . . . overlooked the evidence . . . of [the disability claimant's] suicidal thinking and trip to the hospital").

    2.    *Daily Activities*

As the Seventh Circuit has observed, "working sporadically or performing household chores are not inconsistent with being unable to engage in substantial gainful activity." *Engstrand*

*v. Colvin*, 788 F.3d 655, 661 (7th Cir. 2015). That is because there are "critical differences between activities of daily living and activities in a full-time job[.] . . . [A] person has more flexibility in scheduling the former than the latter, can get help from other persons . . . and is not held to a minimum standard of performance, as she would be by an employer." *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012). Consequently, an ALJ must strike a balance. On the one hand, an ALJ may not "equat[e] activities of daily living with an ability to work." *Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016). On the other hand, "it is entirely permissible to examine . . . a claimant's daily activities[] to assess whether testimony about the effects of [her] impairments was credible or exaggerated." *Prill v. Kijakazi*, 23 F.4th 738, 748 (7th Cir. 2022). For example, if activities of daily living involve the kinds of exertions that contradict the claimant's testimony, the ALJ can properly discount the claimant's testimony regarding symptoms. *E.g.*, *Mitze v. Colvin*, 782 F.3d 879, 880-82 (7th Cir. 2015) (affirming ALJ's denial of benefits where claimant trained for a marathon and "ran 5,000 meters in a race.").

In denying Cassey A. benefits, the ALJ emphasized Cassey A.'s activities of daily living, including "managing medication and attending medical appointments." [Filing No. 9-2 at 18.] From these meager activities, the ALJ concluded that Cassey A. has a "greater degree of functional capacity than claimed." [Filing No. 9-2 at 18.] This was error. Managing medication and attending medical appointments, the bare minimum of tending to her own medical care, are far less rigorous activities than other activities that the Seventh Circuit has instructed do not support an inference that a claimant can perform full-time light work. *See, e.g.*, *Thomas v. Colvin*, 826 F.3d 953, 961 (7th Cir. 2016) (reversing and remanding in favor of disability claimant with fibromyalgia because "her ability to do limited chores, cooking, and self-care says little about her ability to perform the tasks of a full-time job"); *Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir.

13

2014) (reversing and remanding in favor of disability claimant who "prepared meals, shopped, washed dishes, swept, and did a number of other chores," which "fell well short of an ability to do full-time light work."); *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir.2000) (reversing and remanding in favor of disability claimant because "minimal daily activities" such as preparing simple meals, weekly grocery shopping, taking care of family member, and playing cards "do not establish that a person is capable of engaging in substantial physical activity").

Even Cassey A.'s attempt at part-time work would be an insufficient basis to conclude that she could engage in light work, especially given the fact that her mental health conditions caused her to lose her job. *See Larson*, 615 F.3d at 752 (reversing and remanding to award benefits for disability applicant who "was fired from her job . . . because of her nervous breakdown . . . and . . . quit her job . . . because of the stress"). Cassey A.'s ability to take medication and attend appointments does not equal the ability "to stand and walk for six hours a day," which is required by light work. *Allen v. Sullivan*, 977 F.2d 385, 390 (7th Cir. 1992). The ALJ's analysis of daily activities was erroneous because it "failed to consider the difference between a person's being able to engage in sporadic physical activities and her being able to work eight hours a day five consecutive days of the week." *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004).

**B.     Harmless Error**

The Commissioner asserts generally that Cassey A. "cannot demonstrate . . . that remand might lead to a different result" since the ALJ "provided other reasons for discounting [her] subjective complaints." [Filing No. 14 at 9; Filing No. 14 at 11.] Cassey A. argues in her reply that the result on remand would be different, reiterating her earlier arguments, and emphasizing that the ALJ ignored her mental-health hospitalization, which occurred after state-agency physicians examined her. [Filing No. 16 at 2-5.]

14

As the Seventh Circuit has explained, "[a]n ALJ should not rely on an outdated assessment if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion." *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018), *as amended on reh'g* (Apr. 13, 2018). When an ALJ relies on such an outdated assessment after new medical evidence "change[s] the picture so much" such that older evidence is rendered "stale," the ALJ's decision is subject to remand. *Id.* at 729 (reversing and remanding in favor of disability applicant with mental health conditions whose later medical records indicated more severe symptoms) (citation omitted).

In this case, the ALJ "found persuasive the opinions of the state agency psychological consultants" and "mental status and psychiatric exams," which "showed minimal to normal findings, aside from depressed mood and affect." [Filing No. 9-2 at 19.] Those medical sources predate Cassey A.'s hospitalizations in September and October 2022. [Filing No. 9-3 at 32 (February 2022); Filing No. 9-3 at 44 (May 2022); Filing No. 9-10 at 232; 280 (March–June 2022)]. Those earlier "normal findings" are radically different from Cassey A.'s later hospital stays, which describe "intermittent suicidal ideation," multiple prior overdoses, and a "history of holding [a] loaded gun to [her] head." [Filing No. 9-10 at 187.] "A person who has a chronic disease," such as bipolar disorder, "is likely to have better days and worse days," which can be said for Cassey A. *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008) (reversing and remanding in favor of disability applicant with bipolar disorder). The ALJ evaluated Cassey A.'s condition on its better days and erroneously ignored her condition on its worst days.

An error is harmless only if a reviewing court is "convinced" that the ALJ would reach the same result on remand. *Hill v. Colvin*, 807 F.3d 862, 869 (7th Cir. 2015) (citation omitted). In reviewing the record and the ALJ's numerous errors, the Court is not convinced.

## IV.
### Conclusion

The ALJ's analysis of conservative treatment and daily activities, taken together, creates a Catch-22: if Cassey A. did not manage her medications and attend medical appointments, that could be considered conservative treatment, precluding a finding of disability. *See* SSR 16-3P, 2017 WL 5180304 at *10 (ruling that "[a]n individual's symptoms may not be severe enough to prompt him or her to seek treatment"). But if she did manage her medications and attend medical appointments, that could "suggest a greater degree of functional capacity than claimed," also precluding a finding of disability. [Filing No. 9-2 at 18.] Further, her symptoms were discounted for not receiving emergency care for physical conditions, yet were ironically ignored after having actually received emergency care for mental conditions. A Social Security disability claimant should not be forced to navigate these paradoxes. Because the ALJ's decision is "unreliable because of serious mistakes or omissions," the ALJ has failed to build a logical bridge from the evidence to his conclusion. *Sarchet*, 78 F.3d at 309 (reversing and remanding in favor of disability applicant with fibromyalgia). For the foregoing reasons, the Court **REVERSES** the ALJ's decision denying Cassey A. benefits and **REMANDS** this matter for further proceedings pursuant to 42 U.S.C. § 405(g) (sentence 4) as detailed above.[4] Final judgment shall enter accordingly.

Date: 7/19/2024

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

---

[4] Because the Court's decision depends primarily on the ALJ's erroneous analysis of conservative treatment and daily activities, the Court need not address how Cassey A.'s allegations of pain, fatigue, and other symptoms, if properly credited, would have affected the ALJ's analysis of other issues, such as whether her fibromyalgia meets or equals a listed impairment, though the Court notes that a relevant listing may be 12.04 "Affective Disorders." *See Larson*, 615 F.3d at 747-48, 750 (reversing and remanding in favor of disability claimant who had depression).

Distribution:

Elaine Kuntz
Social Security Administration
elaine.kuntz@ssa.gov

Catherine Seagle
Social Security Administration
catherine.seagle@ssa.gov

Julian Clifford Wierenga
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
julian.wierenga@usdoj.gov

Kirsten Elaine Wold
Hankey Marks & Crider
kwold@hankeylaw.com